SKINNY'S, INC.

v.

HICKS BROTHERS CONSTRUCTION COMPANY OF ABILENE, INC.

No. 5471.

Court of Civil Appeals of Texas, Eastland.

May 29, 1980.

W. K. Rutledge, Rutledge, Rutledge & Connally, Abilene, for appellant.

William Tippen and Barbara Rollins, Bradbury & Tippen, Paul J. Harris and Lester O. Berg, Abilene, for appellee.

DICKENSON, Justice.

The principal issues are the scope of an oral agreement and the sufficiency of proof as to the amounts due for labor and materials.

The general contractor, Hicks Brothers Construction Company of Abilene, Inc., sued the owner, Skinny's, Inc., for labor and materials furnished plus "contractor's fees" equal to 20% of the actual cost of labor and materials. Hicks Brothers also sought foreclosure of eleven Mechanic's Liens which had been filed in connection with the unpaid, disputed bills. The owner filed a cross-action against the general contractor, and a subcontractor, Binswanger Glass Company, filed a petition in intervention, seeking payment from the general contractor in the sum of $12,546.00 plus attorney fees and also seeking foreclosure on three of the owner's properties in connection with its Mechanic's Liens. Following a nonjury trial, judgment was rendered for the general contractor against the owner for the sum of $176,761.71 plus prejudgment interest of $10,054.76 and attorney fees of $24,000.00; the owner was given an offset of $2,893.00 on its cross-action; the subcontractor was awarded judgment against the general contractor for the sum of $12,546.00 plus prejudgment interest of $713.58 and attorney fees of $1,000.00; and judgment was rendered against the owner for foreclosure of all fourteen Mechanic's Liens. The owner appeals. We affirm.

The trial court made findings of fact which include the following:

\* \* \* \* \* \*

3. On or about April 11, 1978, at Abilene, Taylor County, Texas, Plaintiff and Defendant entered into an oral contract whereby Plaintiff agreed to furnish labor and materials for the construction of improvements upon properties owned by the Defendant.

4. Defendant agreed that Plaintiff was to be paid for the actual cost of the labor used in, subcontracts arranged for and supervised by Plaintiff, and materials purchased for the construction of said improvements and, in addition thereto, 20% of the amount of that cost for contractor's services and overhead.

5. On or about May 10, 1978 Plaintiff began to procure and furnish labor, materials, and subcontractors pursuant to the agreement between the parties and continued performing in accordance with the agreement originally made by the parties until on or about August 16, 1978 when the Defendant refused to pay for such services and asked the Plaintiff to discontinue work.

6. Plaintiff periodically delivered statements to the Defendant showing the actual costs incurred by Plaintiff, plus an amount equal to 20% of said actual costs.

7. During the initial period of the performance of the contract, Defendant fully paid the amount shown on the statements so delivered by Plaintiff which included the contractor's services and overhead to that time. On or about August 16, 1978, the Defendant ceased all payment and has since refused to make any payment as demanded by Plaintiff.

8. The improvements that Plaintiff agreed to construct consisted of small grocery stores, generally known as convenience stores, together with attendant retail gasoline pumping facilities. Additionally, Plaintiff was to construct two storage buildings.

9. For use in the construction contract, Plaintiff purchased twenty prefabricated metal buildings which were designed for the purposes of this contract and which are of substantially less value for any purpose other than that contemplated for this contract. Four of these prefabricated metal buildings were erected on the property owned by Defendant. The other sixteen have not been erected. Fourteen are located on the property of Plaintiff. The two for storage buildings are on the property of Defendant.

10. The total cost incurred by Plaintiff for materials purchased under the contract, and for labor used in constructing the improvements, is $407,533.19. Plaintiff is due under the contract an additional $81,506.64, being 20% of the cost of the labor and materials. Plaintiff has received $312,278.12 in payment from the Defendant. The total amount due and owing Plaintiff under the contract is therefore $176,761.71. This amount is just and reasonable and is now due and owing.

11. The paving done on the location at the job site identified as East Highway 80 is defective and Defendant is entitled to a set-off for the repair of such pavement, said set-off being in the amount of $2,893.00.

\* \* \* \* \* \*

The owner has briefed eleven points of error, contending first that there is no evidence to support the trial court's finding of an "express contract" for the general contractor to furnish labor and materials for the construction of convenience stores on "numerous properties." In the alternative the owner contends that this finding is against the great weight of the evidence and is manifestly unjust.

The trial court's findings of fact have the same force and dignity as a jury verdict; if supported by any competent evidence, they will not be disturbed on appeal unless they are against the great weight of the evidence. See 4 McDonald, Texas Civil Practice § 16.05 (rev.1971). In testing the court's findings on the complaint that there is no evidence to support them, we will consider only the evidence and inferences which support the findings, disregarding all evidence to the contrary. *Brown v. Frontier Theatres, Inc.*, 369 S.W.2d 299 (Tex. 1963). In considering the complaint that these findings are against the great weight of the evidence, we will consider all of the evidence. *In re King's Estate*, 244 S.W.2d 660 (Tex.1951).

George Hicks, the general contractor's president, testified that he visited Joe Davis, the owner's president, in the early part of 1978 and later submitted a typed proposal to build a 50′ × 50′ × 12′ metal building. The written proposal was not accepted, and Hicks refigured the building, using the dimensions of 40′ × 60′ × 12′. At this time Hicks said that Davis talked with him about them starting to do the work on a "cost plus 20%" basis. Hicks said there was no change in this arrangement until they quit work. The general contractor worked on seventeen different locations, and it furnished labor and equipment. It also arranged for subcontractors who looked to the general contractor for payment.

Hicks also testified that the first three invoices included the "20% fee for contractor's services." One of the invoices was revised by Charley Guernsey, the owner's treasurer, and he applied the 20% figure to the invoice. The fourth billing was on Au-

gust 14, 1978. The owner paid the actual costs of this billing (except for one disputed item which was postponed by agreement), but the owner deducted the 20% fee for contractor's services. Several metal buildings had been charged to the owner at the actual wholesale cost paid by the general contractor, and a dispute developed as to whether the 20% fee should be added to the cost of these buildings. At this point all work ceased.

On cross-examination Hicks testified that the owner's people "almost daily came up with a new location or a new project that they wanted done." He considered that his company was the general contractor on those jobs, and they did brick work, carpentry, ceiling work, floor tile and glass work at various locations. They also arranged for various subcontractors. Hicks testified that they had a "continual-type agreement" and that they "went from one job to the next with understanding we were to take care of the work for them."

Joe Davis, the owner's president, testified that he employed Hicks Brothers on a basis of "ten and ten, meaning that we would pay them 10% as overhead and 10% as profit." He said that he did not agree to pay 20% extra for the buildings which he ordered. On cross-examination Davis said "they went as I told them to go."

We hold that there is evidence to support the trial court's findings 3, 4, 5, 6, 7 and 8, as quoted above. We also hold that those findings are not against the great weight of the evidence.

Appellant's next contentions are that the trial court erred in the admission of certain "business records" and that the evidence is legally and factually insufficient to support the finding that the owner is indebted to the general contractor in the sum of $176,-761.71. These contentions are overruled.

■ If certain business records were improperly admitted, we must presume that the trial judge considered only the admissible evidence in this nonjury trial. *Victory v. State*, 158 S.W.2d 760, at 765 (Tex.1942); 4 McDonald, Texas Civil Practice § 16.04 (rev.1971).

■ George Hicks and Sherry Hicks testified as to the methods which were used by the general contractor in keeping its business records. The "job cost sheets" were based upon the daily "foreman's reports." The job cost sheets were properly admitted under Tex.Rev.Civ.Stat.Ann. art. 3737e (Vernon Supp. 1980). There was testimony that these records were made in the regular course of business, that the charges were verified by the various job foremen who had personal knowledge of the charges, and that the entries were made near the time of the work or reasonably soon thereafter. While some of the entries were cryptic, the objection goes to the weight of the evidence and not to its admissibility. As our Supreme Court stated in *Black Lake Pipe Line Company v. Union Construction Company, Inc.*, 538 S.W.2d 80, at 93 (Tex. 1976):

> (I)t is for the trial court in the exercise of its discretion to determine whether the opposing party had an adequate opportunity to examine the records.

The evidence is conflicting as to the opportunity afforded for examining these records prior to trial, and we must defer to the trial court on this point.

■ Appellant's next contentions concern the thirteen metal buildings which the trial court's judgment states ". . . now in the possession of Plaintiff (general contractor) are the property of the Defendant (owner) and are to be delivered to the Defendant (owner) when this judgment is fully satisfied." One point argues that the trial court erred in allowing the general contractor to retain possession of these buildings until the judgment is satisfied. Another point claims that the general contractor converted these buildings to its own use and that it owes the owner for the value of those buildings. These points are overruled.

Tex.Bus. & Com.Code Ann. § 2.703 (Vernon 1968) provides that where the buyer fails to make a payment due on or before delivery, the seller may withhold delivery of the goods. Consequently, there was no conversion.

Appellant's next contentions concern the sufficiency of proof as to the Mechanic's Liens. These points of error are overruled. The objection to the liens at the trial court was that "the affidavits do not comply with the requirements of the statutes, which requires a statement of the kinds of work done or the materials furnished, which is not in any of those affidavits."

■ Tex.Rev.Civ.Stat.Ann. art. 5455 (Vernon Supp. 1980), concerning liens for mechanics, contractors and material men, now provides that a general statement of the kind of work done or material furnished is sufficient and that:

It shall not be necessary to set forth the individual items of work done or material furnished or specially fabricated. Any abbreviations or symbols customary in the trade may be used.

These liens were sufficient to comply with Article 5455, supra. See *Matthews Construction Company, Inc. v. Jasper Housing Construction Co.*, 528 S.W.2d 323, at 329 (Tex.Civ.App.—Beaumont 1975, writ ref'd n. r. e.).

■ For the first time on appeal, the owner claims that there was no evidence of mailing copies of the lien affidavits to the owner by certified mail in compliance with Tex.Rev.Civ.Stat.Ann. art. 5453 (Vernon Supp. 1980). This was not the basis of the objection when the liens were introduced into evidence. Tex.R.Civ.P. 324 now requires a motion for new trial to present a complaint which has not otherwise been ruled upon by the trial court. If this objection had been made at trial, the general contractor and the subcontractor would have been afforded the opportunity of proving the notice, as alleged in their pleadings.

■ The owner relies on *Bunch Electric Company v. Tex-Craft Builders, Inc.*, 480 S.W.2d 42, at 46 (Tex.Civ.App.—Tyler 1972, no writ), which stated:

Appellant failed to offer any proof showing the notice of the claim was sent by certified or registered mail. . . . Having failed to offer proof showing the notice was mailed . . . ., appellant

failed to establish the existence of a cause of action . . . . .

While we have been unable to find any case directly in point, and have been cited none, we have concluded that Rule 93(m) has no application to the facts presented here.

*Bunch Electric* is distinguishable on its facts, for it concerned the requirements of Tex.Rev.Civ.Stat.Ann. art. 5160 (Vernon 1971), rather than Article 5453, supra. We decline to follow its rationale, and we hold that Tex.R.Civ.P. 54 is applicable and that the general contractor and the subcontractor were required to prove only such conditions precedent as were specifically denied by the owner. See *Continental Contractors, Inc. v. Thorup*, 578 S.W.2d 864, at 866 (Tex. Civ.App.—Houston (1st Dist.) 1979, no writ).

The last point of error deals with attorney fees. It has been considered and is overruled.

The judgment of the trial court is affirmed.