NO. 07-07-0392-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

OCTOBER 29, 2008
______________________________

EDDIE RIOS A/K/A EDDIE RIOS WHITE, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â _________________________________

FROM THE COUNTY COURT OF HUTCHINSON COUNTY;

NO. 35,685; HONORABLE FAYE BLANKS, JUDGE
_______________________________


Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.
MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Appellant, Eddie Rios, appeals from an adjudication of guilt entered by the trial court
on April 25, 2007. After hearing evidence on the issue of punishment, the trial court
assessed a term of confinement of 365 days in the Hutchinson County Jail. We dismiss
for want of jurisdiction.
Â 
Â 
Factual and Procedural Background
Â Â Â Â Â Â Â Â Â Â Appellant pleaded guilty, pursuant to a negotiated plea agreement, on July 19, 2006,
to the misdemeanor offense of resisting arrest. In accordance with the plea agreement,
the trial court deferred entering an adjudication of guilt and placed appellant on community
supervision for a period of one year. Appellant did not appeal the entry of the deferred
adjudication. Thereafter, the State filed its first amended motion to proceed with
adjudication on February 7, 2007. The Stateâs amended motion alleged appellant had 1)
failed to report to his supervision officer for the months of November and December 2006
and January 2007, 2) failed to pay his community supervision fee and his administration
fee, and 3) committed the offense of assault. The trial court conducted a hearing on the
issue of adjudication on March 27, 2007. During the hearing, appellant objected to the
receipt of evidence concerning the new offense, alleging that since the prosecuting
authority for the felony offense, the District Attorney for the 316th Judicial District, had not
sought an indictment and the restitution owed the victim had been made part of a plea
agreement on an unrelated felony, the evidence was precluded under the theory of double
jeopardy. The trial court overruled the objection and proceeded to hear the evidence. At
the conclusion of the hearing on the motion to adjudicate, the trial court adjudicated
appellant guilty of the underlying offense of resisting arrest. After a separate hearing on
punishment, held on April 25, 2007, the trial court assessed punishment at confinement
in the county jail for a period of 365 days. This appeal followed.
Â Â Â Â Â Â Â Â Â Â Through one issue appellant now claims that the trial court abused its discretion by
sentencing appellant to one year in jail because the State should have been barred from
litigating the motion to adjudicate guilt based upon the doctrine of collateral estoppel. We
dismiss for want of jurisdiction.



Analysis
Â Â Â Â Â Â Â Â Â Â Â The applicable provision of the Code of Criminal Procedure in force at the time of
appellantâs hearing controls the disposition of this case.


 This provision was amended and
is now codified as article 42.12 section 5(b) to provide that a defendant in an adjudication
proceeding has the same rights to a review of the trial courtâs decision to adjudicate as any
other defendant in a revocation of community supervision proceeding. See Tex. Crim.
Proc. Code Ann. Â§ 42.12(5)(b) (Vernon Supp. 2007). The new provision is applicable to
cases heard on or after June 15, 2007. 
Â Â Â Â Â Â Â Â Â Â Accordingly, appellantâs rights to appeal the adjudication is governed by the former
statute. The Texas Court of Criminal Appeals has spoken to this issue and has uniformly
held that the trial courtâs decision to adjudicate, under the former statute, was absolutely
discretionary and not subject to review. See Davis v. State, 195 S.W.3d 708, 710
(Tex.Crim.App. 2006). Therefore, we have no jurisdiction to review the trial courtâs decision
to adjudicate appellant guilty of the offense of resisting arrest. 
Â Â Â Â Â Â Â Â Â Â However, appellant couches his error in terms of abuse of discretion in sentencing
appellant. This would seem to allow us to review the decision to assess appellantâs
punishment to one year in the county jail. See Hogans v. State, 176 S.W.3d 829, 833
(Tex.Crim.App. 2005). However, a closer read of the record reveals, that despite the
wording of appellantâs issue, the alleged error occurred during the adjudication phase of
the trial. As stated by the Hogans opinion, âthe asserted error must directly and distinctly
concern the second phase; the claim must, on its face, relate to the sentence imposed, not
to the decision to adjudicate.â Id. at 834. Appellant is complaining of the admission of
evidence that occurred during the adjudication phase. As such, it is not appealable. Davis,
195 S.W.3d at 710. Accordingly, we must dismiss the appeal for want of jurisdiction. 
Conclusion
Â Â Â Â Â Â Â Â Â Â Having determined we do not have jurisdiction to entertain this appeal, the same is
dismissed.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Mackey K. Hancock

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice





Do not publish. 




of this question. In that regard, the evidence clearly shows that
contrary to the instructions in the will, with respect to money loaned by the estate, Ima
commingled the interest and corpus of repayments made on the loan. Although Ima
asserts that the $60,000 was included in the corpus of the estate for distribution, the
record does not show she was able to trace those repayments to show their inclusion in
that corpus. See Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493, 498-99 (1943). Ima's
third and fourth issues are overruled.

 In determining Ima's fifth and sixth issues, we must examine the purchase of the
Keyes Farm. With respect to that transaction, the trial court found that Ima had diverted
to her use and benefit $623,333 that belonged to the estate. In 1989, J.T. and Ima
purchased a farm near Keyes, Oklahoma, for $1,100,000. Although J.T. and Annie
received a 2/3 interest in the farm with Ima receiving the other 1/3 interest, all of the money
came from Ima and the estate. To finance the purchase, ostensibly J.T. borrowed
$366,666.66 from the estate and the same amount from Ima individually. However, Ima's
ledger sheets show, and she admitted, that the estate actually contributed 85%, or
$623,333.05 of the money loaned to J.T. Ima did not say whether the remainder of the
money advanced came from estate funds or her separate funds. She admitted that if the
money was repaid, the estate corpus would receive only $366,666.66, which was less than
actually came from estate funds. Ima admitted that she did not give any credit for the
estate's contribution to the purchase price when she calculated the amount for distribution
of the estate.

 Ima testified that although J.T. paid some interest on the notes executed by him, no
principal was ever paid. The farm was sold in 1994 for approximately $2,000,000. Of the
profit, two-thirds went to J.T. and one-third to Ima. The loans against the property were
paid off at the time of the sale. Both Ima and J.T. directed the title company in writing to
distribute the remainder of the sale proceeds after the liens were paid, with $594,473
going to J.T. and Annie and $663,904.02 going to Ima. Of the approximately $1,397,000
that she received from the sale, including the repayment of the loans and the portion of the
remainder paid to her, Ima did not return any of those funds to the estate, but placed them
in a certificate of deposit in her own name. The evidence is therefore both legally and
factually sufficient to support the trial court's finding that she diverted $623,333 from the
estate. Ima's fifth and sixth issues are overruled. 

 We note J.T.'s first cross-issue contention that the evidence actually supports an
award to him of $920,318.64 with respect to the loans made in connection with the
purchase of the Keyes Farm. This is so, he argues, because the evidence is
uncontroverted that the estate contributed more than $623,333 to its purchase. Jordan
Mills testified that Ima kept a lot of the estate money in certificates of deposit in the estate's
name. In trying to determine where the money for the purchase of the farm came from,
Mills looked at bank statements, checks, and deposit slips. He claimed to have been able
to trace the amount of estate money used to purchase the farm to an amount of
$920,318.04 based on a ledger sheet used by Ima showing various bank deposits which
were gathered to make up the purchase price of the farm. Further, because the total price
was $1,101,476 and $920,318.64 is 83.55% of that amount and, because he saw some
margin notations on Ima's balance sheets showing 85% attributable to the estate and 15%
attributable to J.T., Mills believed his figure was correct.

 Thus, there was conflicting testimony from Ima and Mills as to the amount of funds
contributed by the estate to the purchase of the Keyes Farm with Ima testifying that the
estate only contributed 85% of the money loaned to J.T. while he contends, supported by
Mills's testimony, the correct amount was 85% of the total purchase price. Because it was
within the trial court's special prerogative as the trier of fact to resolve factual disputes, we
will not disturb the trial court finding. Ima's seventh issue is overruled. 

 The $172,999 included in the trial court's findings as the estate's lost profit on the
Keyes Farm transaction is the subject of Ima's seventh and eighth issues. While she
contends the evidence does not support that inclusion, J.T. contends the amount of profit
attributable to the estate was actually $297,236.78. The parties agree that the farm was
purchased for $1,100,000 and sold for $2,000,000. Therefore, the profit on the sale was
approximately $900,000. The parties also agree that Ima was entitled to one-third of the
profit or approximately $300,000. If the estate contributed $623,333.05 to the purchase
price of the farm, as the trial court apparently found, that contribution amounted to about
57% of the purchase price. The same percentage of Ima's share of the profit is
approximately $171,000. Although that figure is not the exact amount of the lost profit
found by the court, it is sufficiently close to sustain the trial court's findings. Additionally,
as we have noted, Ima admitted she had deposited all the proceeds from the sale received
by her into a certificate of deposit in her name. Ima's seventh and eighth issues are
overruled.

 In her ninth issue, Ima argues that by electing to confirm the release, conveyance
and consent to distribution, J.T. waived any right to seek her removal as executrix of the
estate. She bases that position on the argument that once J.T. elected to take his share
of the distribution, he had no further interest in the estate and therefore had no standing
to challenge Ima's position as the independent executrix of the estate. In response, J.T.
contends that, although the argument might have had merit if the estate had been worth
what Ima represented, because the trial court found it was worth much more than she had
represented, he has not waived his right to seek her removal.

 The trial court found as a matter of fact that Ima misapplied and converted estate
property, failed to make a full disclosure, misrepresented the value of the estate, and failed
to account, all of which constituted gross misconduct and gross mismanagement in the
performance of her duties, which constituted cause for her removal. Thus, the trial court
concluded, Ima had breached her fiduciary duty and should be removed as executrix. The
trial court further concluded that J.T. was not barred "from seeking relief despite not
actually returning consideration received under the release because he satisfied his
'tender' obligation, and because he has a meritorious claim for compensation in excess of
that consideration."

 The existence of standing is a question of law. A & W Industries, Inc. v. Day, 977
S.W.2d 738, 741 (Tex.App.--Fort Worth 1998, no pet.). For a person to maintain a suit,
he must have standing to litigate the matters at issue. Generally, that means some interest
peculiar to him individually and not as a member of the general public. Id. Ima does not
contest that J.T. would have had standing to seek her removal but, as we noted above, she
argues that he has waived that right. The essence of the trial court findings was that Ima
misrepresented the value of the estate, she intended J.T. to rely on her representations,
he did to his detriment, and that he was entitled to damages above the amount of money
he originally obtained and for which he executed his release. The trial court's findings are
sufficiently supported by the record. Because of these findings, J.T. has not waived his
right to seek Ima's removal, even though he never rescinded his release. Damages and
rescission are not mutually exclusive remedies when both are needed to give complete
relief to the complaining party. See LaChalet International, Inc. v. Nowik, 787 S.W.2d 101,
104 (Tex.App.--Dallas 1990, no writ). The record does not show that the estate
administration has ever been officially closed. That being so, in order to accord J.T.
complete relief, it was proper both to remove Ima as executrix and to allow J.T. to recover
his share of the additional value of the estate above that which he had already received. 
Ima's ninth issue is overruled.

 Much of our discussion above is applicable to Ima's tenth issue, in which she
asserts that because J.T. elected to waive rescission of his previous release agreement,
he is bound by the sums he received under that agreement and is not entitled to receive
anything above what he has already received. However, as we have stated, a party is not
necessarily required to choose between rescission and damages when a party has been
fraudulently induced to enter into a contract. Further, as we noted in our previous opinion
on this matter, before J.T.'s acceptance of a benefit can create an estoppel, it must be
shown that the benefit was accepted with knowledge of all material facts. Frazier v. Wynn,
472 S.W.2d 750, 753 (Tex. 1971). Additionally, J.T. had agreed to accept a one-fourth
distribution of the estate. Even if that agreement was not rescinded, it does not mean that
he would not be entitled to receive a one-quarter distribution based on the true value of
the estate as opposed to the represented value. Ima's tenth issue is overruled.

 In her eleventh issue, Ima posits that J.T. is not entitled to receive attorney's fees
because there is no evidence that presentment of his claim was made as required by
section 38.002 of the Civil Practice and Remedies Code, and a party may not recover
attorney's fees for rescission of a contract. In responding, J.T. argues that he not only
sought recovery of attorney's fees under section 38.001 of the Civil Practice and Remedies
Code, but he also sought recovery of those fees under the Property Code and the
Declaratory Judgments Act (section 37.009 of the Civil Practice and Remedies Code). 
Those rights of recovery, he posits, have not been challenged by Ima. In any event, he
contends, there is sufficient evidence of presentment made in his attorney's affidavit on
the subject of fees.

 Under section 38.001 of the Civil Practice and Remedies Code, a person may
recover reasonable attorney's fees if the claim is on an oral or written contract. Tex. Civ.
Prac & Rem. Code Ann. § 38.001 (Vernon 1997). To recover under that section, the
claimant must present the claim to the opposing party and payment for the just amount
owed must not have been tendered by the opposing party before expiration of the 30th day
after presentation of the claim. Id. Â§ 38.002. While it is true that the filing of suit, in and
of itself, does not constitute the requisite presentment, Panizo v. Young Men's Christian
Ass'n of Greater Houston Area, 938 S.W.2d 163, 168 (Tex.App.--Houston [1st Dist.] 1996,
no writ), a presentment of a claim is timely even if made after suit is filed, if it is made at
least 30 days before trial. K.C. Roofing Co., Inc. v. Abundis, 940 S.W.2d 375, 379 (Tex.
App.--San Antonio 1997, writ denied).

 Attached to J.T.'s attorney's affidavit is a copy of a letter dated August 20, 1998, in
which J.T.'s claim is presented. While the court has discretion as to the amount of
attorney's fees, their award is mandatory if the requirements are met. Jackson Law Office,
P.C. v. Chappell, 37 S.W.3d 15, 23 (Tex.App.--Tyler 2000, pet. denied). Additionally,
attorney's fees have been awarded based on fraud arising from a breach of contract. See
Gill Sav. Ass'n v. Chair King, Inc., 797 S.W.2d 31, 31-32 (Tex. 1990); Schindler v. Austwell
Farmers Co-op, 829 S.W.2d 283, 288 (Tex.App.--Corpus Christi), aff'd on other grounds,
841 S.W.2d 853 (Tex. 1992). Ima's eleventh issue is overruled.

 In her twelfth and final issue, Ima claims she is entitled to a $25,000 offset against
the judgment for the amount of the attorney's fees she was awarded against J.T. in the
prior trial of this cause. She also claims an offset for $117,878.29, the amount she had
already distributed to J.T., together with 10% interest per annum from the date of the
distribution. We note that the trial court has only entered judgment for the additional sums
that should have been included in the value of the estate. Thus, the court has not awarded
J.T. any double recovery in that regard.

 With regard to the offset for the $25,000 attorney fees, J.T. argues that because
Ima did not request such an offset from the trial court, she has waived the right to make
that claim on appeal. Ima neither cites any authority that she is now entitled to such an
offset, nor does she point out in the record where she made such a request. However, in
making our own review of the record, we find that she did make such a request, in addition
to other requested offsets, in her first supplemental answer. However, Ima does not cite
any portions of the record in which she called that particular request to the attention of the
trial court. Our perusal of the record reveals that the only portions of the prior judgment
Ima asked the trial court to take judicial notice of was with respect to two tractors and a
plow, for which she was asking compensation. Also, she did not raise that question in her
motion for new trial. To preserve a complaint for appellate review, the record must show
it was made to the trial court by a timely request, objection, or motion that stated with
sufficient specificity the grounds for the ruling sought so that the trial court might be made
aware of the complaint. Tex. R. App. P. 33.1(a)(1)(A). By failing to meet that requirement,
Ima has failed to preserve that complaint for our review. Ima's twelfth issue is overruled.

 We have already addressed the basis for J.T.'s first cross-issue with respect to the
legal and factual sufficiency of the evidence supporting the trial court's awards with regard
to the $501,000 loan, the Keyes Farm transaction, and the Bohlender elevator note in
discussing Ima's contentions in that regard. We will not, therefore, address those matters
again. However, because we have not addressed the legal and factual sufficiency of the
evidence with regard to the Billups land transaction, and because it is raised by J.T. in that
issue, we will discuss that question.

 In reviewing a legal sufficiency challenge on an issue upon which the complaining
party had the burden of proof, we examine the record to determine if there is any evidence
to support the finding while ignoring all evidence to the contrary and, if there is no
evidence to support the finding, we must see if the contrary proposition had been
established as a matter of law. Holley v. Watts, 629 S.W.2d 694, 696 (Tex. 1982). As
already stated, a factual sufficiency challenge requires us to review the record for some
probative evidence to support the finding and determine if, in light of all the evidence, the
finding is not manifestly unjust. Traylor v. Goulding, 497 S.W.2d 944, 945 (Tex. 1973).

 On February 17, 1993, Ima sold her daughter Barbara the estate's undivided one-half interest in the east one-half of Section 77 and all of Section 78, Block 2, Brooks &
Burleson Survey, in Hartley County. Barbara executed a $47,000 note payable to Ima as
the executrix of the estate, which was secured by a deed of trust on the property. On
November 30, 1995, Ima, as executrix, transferred the note and the liens securing it to
herself. She then released the note and liens on October 29, 1996. In advancing his
challenge, J.T. contends that no payment was made to the estate for this transfer and,
because of this, the value of the estate prior to the distribution should have been increased
by that amount. The trial court did not make any award with respect to this transaction.

 Ima testified that she could not produce a check for a $47,000 payment from her to
the estate or a deposit slip showing a deposit of any such amount to the estate. She also
admitted that Barbara paid her individually the $47,000 and that she deposited the money
in her individual account. She further admitted that in calculating the value of the estate
prior to her distribution, she did not add a separate credit for the $47,000, but that that
amount was already included in her computation of the corpus of the estate. At the time
the estate was distributed in 1996, she had not yet been paid by Barbara. Therefore, she
averred, she had put her own money in the estate and, when Barbara paid her after
Barbara had received her share of the distribution, she was entitled to put the money in
her own individual account. The trial court, in its capacity as factfinder, was entitled to
accept Ima's testimony and, if accepted, as it obviously was, it is both legally and factually
sufficient to uphold the trial court's refusal to award damages in that respect.

 J.T. also contends that he should have been awarded $28,000 of the profit resulting
from the sale of the estate's undivided one-half interest in the land to Barbara. His
argument is based on the proposition that Ima sold the land to Barbara for less than its fair
market value. The 960 acres was included in the inventory of the estate property at a
value of $100 per acre or a total of $96,000. Both Barbara and Ima said the undivided
interest in the land was sold to Barbara for $100 per acre based on its inventory value in
1974. No current appraisal of the land was made at the time of its sale, but neighboring
land sold at $150 per acre.

 Both parties presented expert testimony about the value of the land. Steve Rogers,
a real estate appraiser, was called by J.T. Rogers testified that based on information he
had gathered about comparable land sales, he estimated the value of the land on February
17, 1995, at $185 per acre. To arrive at the value of the undivided one-half interest, he
applied a discount factor of 15% to 20% because a half interest is not marketed easily. 
By his calculations, the interest in the land would have been worth $75,000 at the time of
its sale. However, he admitted he had never actually been on the land and had only seen
it from the road. He initially had not used the neighboring land, which had sold in his
calculations, but later went back and took it into consideration. However, he did not
change his opinion because he felt the sale of the land was supportive of his valuation,
even though it sold for substantially less than other properties he had used.

 Appraiser Leslie Dodson testified for Ima. He also used the sale comparison
approach in arriving at his valuation of the land in 1995. He valued the estate's one-half
interest at $47,500 based on a value of $150 per acre with a 33 1/3% discount factor. He
averred he had used this formula before and it was an accepted method. He had actually
been on the land and said it was important to do so in order to know about potential water
production on the property and its topography. Even though it was substantially similar,
he admitted he valued the land across the road at $168 per acre.

 Again, the trial court had conflicting appraisals before it. As the factfinder, it was
well within its power to judge the credibility of the experts and the evidentiary weight to be
given their opinion. We cannot fault its resolution of the conflict and find no error in its
refusal to award the damages suggested by J.T. The first two cross-issues of J.T. are
overruled.

 In his third cross-issue, J.T. contests the trial court's refusal to award him damages
against Barbara for conspiracy in regard to the Billups land transaction because, he
reasons, the record conclusively establishes such a conspiracy or, in the alternative, the
trial court's refusal to find such a conspiracy was against the great weight of the evidence. 
J.T. argues that the evidence shows Ima and Barbara acted together to transfer the
estate's interest in the land for less than its fair market value and to divert money away
from the estate, and that they failed to disclose those facts to him. Because of their
actions, he reasons, Ima and Barbara are jointly and severally liable for the value of the
land which they diverted from the estate.

 The essential elements of a conspiracy are 1) two or more persons, 2) an object to
be accomplished, 3) a meeting of minds on the object or course of action, 4) one or more
unlawful, overt acts, and 5) damages as the proximate result. Massey v. Armco Steel Co.,
652 S.W.2d 932, 934 (Tex. 1983). Ima denied that she ever talked to Barbara about
attempting to defeat the estate's interest in the land. Further, she did not remember 
whether Barbara objected to the $47,000 sale price, and she had no conversation with
Barbara other than to tell her she would sell her the land.

 Barbara averred that she was told the purchase price for the property would be
$47,000, she did not seek an appraisal of the property and, she admitted, she did not tell
J.T. about the purchase of the property. Although in her earlier testimony Barbara stated 
she had known the property across the road sold for $150 per acre at the time she made
the purchase, at this trial, she denied that was the case. Barbara also admitted that she
did not make a down payment on the land and that she never made any payments on the
land to the estate. Barbara additionally said that Ima told her the estate would be
distributed and Barbara could give a check in payment of the purchase loan at that time. 
Ima had also told her that she, Ima, was going to buy the note from the estate. Barbara 
averred that she and her sister Margaret prepared a summary of the estate banking
transactions after J.T.'s lawsuit was filed. She did not remember what amounts she saw
recorded in that summary, but in her prior testimony, she had agreed that she did not see
the $47,000 payment recorded.

 After reviewing the evidence, we conclude that J.T. has failed to conclusively
establish that Ima and Barbara entered into a conspiracy and the trial court's failure to find
such a conspiracy was not against the great weight of the evidence. The testimony in the
record shows that Ima told Barbara the estate would sell her the property and what the
price would be. The fact that Barbara did not challenge the sale price and, even though
she may have known nearby land sold for more money, that she did not have an
independent appraisal made is not necessarily evidence that she conspired to defraud the
estate. The evidence also showed that Barbara did not know until after J.T.'s lawsuit was
filed that the estate might not have received any money for the land. The resolution of
inconsistencies in the evidence was within the trial court's power as the factfinder to
resolve, and we do not find it reversibly erred in declining to award conspiracy damages
against Barbara. J.T.'s third cross-issue is overruled.

 In his fourth cross-issue, J.T. challenges the amount of prejudgment interest
awarded him. The gist of his complaint is that the interest awarded was based on the time
period from November 16, 1996, to April 6, 2001, even though the judgment was not
signed until May 25, 2001. That being so, J.T. claims his entitlement to additional interest
for the period from April 6, 2001, to May 25, 2001. Although the record shows that J.T.
filed a motion to modify the judgment to correct the amount of interest awarded, there is
nothing in the record showing the trial court ever ruled on it. Ima does not contest that J.T.
would ordinarily be entitled to prejudgment interest to the date of judgment but, she claims,
J.T. is not entitled to any additional prejudgment interest because he drafted the judgment,
including the calculation of prejudgment interest. Thus, he got what he requested, she
asserts.

 The judgment itself recites that the plaintiff is awarded 6% prejudgment interest from
November 16, 1996, "to the date of this Judgment, in the amount of $38.64378 per day."
The judgment further states, "[a]s of the date of this Judgment, the total prejudgment
interest is $61,907.34 . . . ." When a party moves for judgment and judgment is entered
in accordance with the motion, the party waives the right to complain of the judgment on
appeal. Casu v. Marathon Refining Co., 896 S.W.2d 388, 389 (Tex.App.--Houston [1st
Dist.] 1995, writ denied). On the other hand, when a party merely submits a draft judgment
to conform with what the court announced would be its judgment, the party does not waive
his right to complain on appeal. In re Bahn, 13 S.W.3d 865, 875 (Tex.App.--Fort Worth
2000, no pet.); John Masek Corp. v. Davis, 848 S.W.2d 170, 175 (Tex.App.--Houston [1st
Dist.] 1992, writ denied).

 In this case, the record reveals that at the end of trial, the court announced it was
of the belief that the estate was short of money owed to it, but did not announce any
specific award of damages at that time. The court also did not address prejudgment
interest. If the court did make such an announcement at a later time or if it notified the
parties of its decision by letter, it does not appear in the record. There is also no motion
for judgment in the record. Therefore, based on the record before us, the written judgment
was the court's first rendition with respect to prejudgment interest. The error, then, was
judicial rather than clerical. See Comet Aluminum Co. v. Dibrell, 450 S.W.2d 56, 59 (Tex.
1970).

 The judgment was prepared by J.T. and the court entered the judgment draft
submitted by him. Although J.T. could not have known the date the judge would sign the
judgment, he chose to draft it so as to specify the amount of interest awarded. Thus, J.T.
received what he requested and has waived his right to complain on appeal. J.T.'s fourth
cross-issue is overruled.

 In his fifth cross-issue, J.T. complains that the trial court should have awarded him
the entire amount of attorney's fees he proved at trial. In its judgment, the trial court
awarded $98,000 in attorney's fees through trial on the merits, an additional $10,000 if the
judgment was successfully defended in the court of appeals, and another $10,000 if it was
successfully defended in the state supreme court. J.T.'s attorney filed an affidavit in which
he requested $147,043.27 in attorney's fees through trial, with $20,000 for a successful
appeal to the court of appeals and an additional $10,000 for a successful appeal to the
Texas Supreme Court.

 As we noted above, J.T.'s request for attorney's fees is pursuant to section 114.064
of the Property Code, and sections 37.009 and 38.001 of the Civil Practice and Remedies
Code. The relevant portion of the Property Code relates to instances in which a trustee
may recover certain expenses for activities on its behalf. In relevant part, the section
states, "the court may make such award of costs and reasonable and necessary attorney's
fees as may seem equitable and just." Tex. Prop. Code Ann. Â§ 114.064 (Vernon 1995). 
Similarly, section 37.009 of the Civil Practice and Remedies Code provides that in any
proceeding under the Declaratory Judgments Act, "the court may award costs and
reasonable and necessary attorney fees as are equitable and just." Tex. Civ. Prac. & Rem.
Code Ann. Â§ 37.009 (Vernon 1997). J.T. agrees that the award of attorney's fees lies
within the trial court's discretion. We have previously noted that while an award of
attorney's fees pursuant to section 38.001 of the Civil Practice and Remedies Code is
mandatory if the necessary requirements are met, the amount of those fees to be awarded
is discretionary.

 Therefore, under any of the statutes relied on by J.T., the amount of attorney's fees
awarded is reviewed under an abuse of discretion standard. In reviewing an award of
attorney's fees, we must consider 1) the time and labor required, the novelty of the
questions presented, and the skill required to perform the legal services; 2) the likelihood
that the acceptance of the employment precluded other employment by the lawyer; 3) the
fee customarily charged in the locality for similar legal services; 4) the amount involved
and the results obtained; 5) the time limitations imposed by the client or by the
circumstances; 6) the nature and length of the professional relationship with the client; 7)
the experience, reputation, and ability of the lawyer or lawyers performing the services;
and 8) whether the fee is fixed or contingent on results obtained. Aquila Southwest
Pipeline, Inc. v. Harmony Exploration, Inc., 48 S.W.3d 225, 240-41 (Tex.App.--San Antonio
2001, pet. denied).

 In the judgment, J.T. was awarded $296,990.34 and he seeks to recover almost half
that amount in attorney's fees. There were two trials of this case and a prior appeal, the
attorney's fees for which, J.T. argues, cannot be segregated. However, J.T. was
unsuccessful in a portion of the first trial which did become a final judgment. Moreover,
based on the number of times the testimony of witnesses was compared with their
testimony in the first trial, J.T.'s attorneys were able to use testimony from the first trial with
which they were familiar. Considering all the factors we are required to consider, along
with the questions involved, the skill required, and the customary charges in the area, we
find no abuse of discretion in the trial court's attorney's fees award. J.T.'s fifth cross-issue
is overruled.

 In his sixth cross-issue, J.T. posits that the trial court erred in failing to award
exemplary damages. He reasons the evidence conclusively shows that Ima willfully
breached her fiduciary duties and intentionally misrepresented material facts regarding the
assets of the estate and their value. He also argues that Barbara participated in those
activities. We have already held that the trial court did not err in failing to award actual
damages against Barbara, and there is no need to discuss exemplary damages as to her. 

 The Civil Practice and Remedies Code provides for the award of exemplary
damages:

 (A) . . .[E]xemplary damages may be awarded only if the claimant proves by
clear and convincing evidence that the harm with respect to which the
claimant seeks recovery of exemplary damages results from:


 (1) fraud;


 (2) malice; or


 (3) wilful act or omission or gross neglect in wrongful death actions
brought by or on behalf of a surviving spouse or heirs of the decedent's
body, under a statute enacted pursuant to Section 26, Article XVI, Texas
Constitution. . . .


Tex. Civ. Prac. & Rem. Code Ann. Â§ 41.003(a) (Vernon 1997).


 The trial court stated in its findings of fact that Ima misrepresented the value of the
estate to J.T., she intended J.T. to rely on her misrepresentations about the value of the
estate, he actually relied on her misrepresentations, he did not have actual knowledge of
the true value of the estate, and he suffered damages proximately caused by those
misrepresentations. The trial court further found that Ima's actions in misapplying and
converting estate property, failure to make full disclosure, her misrepresentations about
the value of the estate, and her failure to account constituted gross misconduct and gross
mismanagement in the performance of her duties as executrix. Thus, assuming the
evidence was sufficient to support those findings, the trial court could have awarded
exemplary damages. The question, then, becomes whether the trial court was required
to award exemplary damages in this situation.

 The statute itself does not state that exemplary damages must be awarded if fraud
or malice is found, and J.T. has cited no authority that states that proposition. Punitive
damages are only proper in exceptional cases. C & D Robotics, Inc. v. Mann, 47 S.W.3d
194, 201 (Tex.App.--Texarkana 2001, no pet.). The factfinder may assess punitive
damages to deter future misconduct, punish wrongdoers, and reimburse the plaintiff for
remote losses. Browning-Ferris Industries, Inc. v. Lieck, 845 S.W.2d 926, 946 (Tex.App.--Corpus Christi 1992), rev'd on other grounds, 881 S.W.2d 288 (Tex. 1994). The
wrongdoer in this instance is an elderly woman, which, as the trial court noted, by her own
admission is no longer able to fulfill the role of executrix of the estate, at least in part,
because of failing eyesight. The will also gave Ima the right to use the corpus for her own
welfare, support, and maintenance in the manner to which she was accustomed. She
never used that option. Additionally, there was evidence that Ima and J.T. had long had
dealings with one another, including J.T.'s requests for loans from the estate to resolve his
own bankruptcy problems, and some of those dealings had resulted in litigation by J.T. in
which no liability on Ima's part was determined. In view of all of this, the trial court could
have determined there was no need to assess exemplary damages to deter future
misconduct inasmuch as Ima would no longer be in a position to commit those same acts. 
It could also have determined that J.T. had not suffered any remote losses. J.T.'s sixth
cross-issue is overruled.

 In summary, because we have found no reversible error, all issues presented by
both parties are overruled, and the judgment of the trial court is affirmed. 


 John T. Boyd

 Chief Justice



Do not publish.




Johnson, J., concurs.

NO. 07-01-0343-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



MARCH 1, 2002



______________________________




IMA McADAMS, INDIVIDUALLY AND AS EXECUTRIX OF THE


ESTATE OF J.Y. McADAMS, DECEASED, APPELLANT



V.



J.Y. JR. (J.T.) McADAMS AND ANNIE McADAMS, APPELLEES




_________________________________



FROM THE 69TH DISTRICT COURT OF HARTLEY COUNTY;



NO. 3739H; HONORABLE H. BRYAN POFF, JR., JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

 I concur with the results reached by the majority as to Ima's ninth issue and J.T.'s
fourth cross-issue. Otherwise, I join the majority opinion. 


 Phil Johnson

 Justice


Do not publish. 
1. Coretha Brown is now deceased.
2. Nothing in the record indicates the estate has been closed.